UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br>378 N. Main Avenue<br>Tucson, AZ 85701;<br><br>           Plaintiff,<br><br>    v.<br><br>DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior,<br>1849 C Street, NW<br>Washington DC 20240;<br><br>BRIAN NESVIK, in his official capacity as Director of the U.S. Fish and Wildlife Service,<br>1849 C Street, NW<br>Washington DC 20240; and<br><br>U.S. FISH AND WILDLIFE SERVICE,<br>1849 C Street, NW<br>Washington, DC 20240;<br><br>           Defendants. | Case No. 26-391<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.    Plaintiff Center for Biological Diversity ("Center") challenges the U.S. Fish and Wildlife Service's ("Service") violation of section 4(b)(3)(A) of the ESA, 16 U.S.C. § 1533(b)(3)(A), by failing to timely issue an initial determination ("90-day finding") in response to the Center's petition to list the saltmarsh sparrow as an endangered or threatened species, in violation of the Endangered Species Act ("ESA" or "Act"). The Service's failure delays lifesaving protections for the saltmarsh sparrow, increasing its risk of extinction.

2. In order to address this violation, Plaintiff seeks an Order declaring that the Service violated section 4(b)(3)(A) of the ESA, 16 U.S.C. § 1533(b)(3)(A), and directing the Service to issue the finding by a date certain.

## JURISDICTION

3. This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(c), (g) (ESA citizen suit provision) and 28 U.S.C. § 1331 (federal question). This Court has authority to issue declaratory and injunctive relief pursuant to the ESA, 16 U.S.C. § 1540(g); 28 U.S.C. §§ 2201–2202; and the Administrative Procedure Act, 5 U.S.C. § 706(2).

4. Plaintiff provided Defendants with 60-days' notice of their ESA violation, as required by 16 U.S.C. § 1540(g)(2)(C), by a letter to the Service dated September 15, 2025. Defendants have not remedied the violation set out in the notice letter and an actual controversy exists between the parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

6. Plaintiff, CENTER FOR BIOLOGICAL DIVERSITY, is a national, non-profit conservation organization that works through science, law, and policy to protect imperiled wildlife and their habitat. The Center is incorporated in California and headquartered in Tucson, Arizona, with offices throughout the United States, including in Washington, D.C. The Center has more than 94,000 active members throughout the country.

7. The Center brings this action on behalf of its members who derive recreational, aesthetic, and other benefits from the saltmarsh sparrow and its habitat. Center members regularly recreate in saltmarsh sparrow habitat with hopes of viewing the species throughout its range, including in

Connecticut, Delaware, Maryland, Massachusetts, and New Jersey. The Center's members' have visited these habitats on numerous occasions in the past and intend to continue to do so for the foreseeable future, including during regular trips in Essex Bay, Massachusetts, and planned trips to visit habitat on the Delmarva Peninsula in May 2026 and the Great Meadows Marsh in Connecticut during the summer of 2026.

8. For instance, Brett Hartl, a member of the Center, has visited the habitat of the saltmarsh sparrow on the Atlantic coast numerous times beginning in 2008, searching for this rare and difficult to observe bird species. He was successful in observing the sparrow for the first time in 2016 at the Bombay Hook National Wildlife Refuge in Delaware and has also observed the saltmarsh sparrow at Blackwater National Wildlife Refuge and on Assateague Island in Maryland. Most recently, he observed several saltmarsh sparrows at the Edwin B. Forsythe National Wildlife Refuge in New Jersey in the fall of 2024. The photograph below is of one of the sparrows he saw on that trip. He also has plans to search for saltmarsh sparrows again in May of 2026 at the south end of the Delmarva Peninsula and intends to return to the East Coast regularly into the future beyond next year to continue looking for and observing saltmarsh sparrows and other wildlife.

9. The Service's violation of the ESA's deadline has delayed ESA protections for the saltmarsh sparrow. This inaction harms Plaintiff's members' interests in the sparrow by permitting the species' continued trajectory toward extinction, thereby decreasing the likelihood that the Center's members will encounter the species as part of their personal recreational excursions. These injuries are actual, concrete injuries presently suffered by Plaintiff's members, are directly caused by the Service's failure, and will continue unless the Court grants relief, which could redress these injuries by providing ESA protections to the sparrow, promoting its conservation and recovery. Plaintiff and its members have no other adequate remedy at law.

10. Defendant DOUG BURGUM is the Secretary of the U.S. Department of the Interior ("Secretary") and has the ultimate responsibility to administer and implement the provisions of the ESA. Defendant Burgum is sued in his official capacity.

11. Defendant BRIAN NESVIK is the Director of the Service and is charged with ensuring that agency decisions comply with the ESA. Defendant Nesvik is sued in his official capacity.

12. Defendant U.S. FISH AND WILDLIFE SERVICE is the agency within the Department of the Interior charged with implementing the ESA for the saltwater sparrow. The Secretary of the Interior has delegated administration of the ESA to the Service. 50 C.F.R. § 402.01(b).

## STATUTORY FRAMEWORK

13. The Endangered Species Act, 16 U.S.C. §§ 1531–1544, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Its fundamental purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

14. The ESA defines a "species" as "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16).

15. A species is "endangered" when it "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is "threatened" when it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). If the Service determines that the species is not endangered or threatened throughout all its

4

range, the ESA requires the agency to examine whether it is endangered or threatened throughout any "significant portion" of its range. *Id.* § 1532(6), (20).

16. The ESA requires the Service to determine whether any species is endangered or threatened because of any one of, or combination of, the following factors: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. *Id.* § 1533(a)(1).

17. The Service must base all listing determinations "solely on the basis of the best scientific and commercial data available." *Id.* § 1533(b)(1)(A).

18. Recognizing that timely protections for imperiled species are essential to protecting these species before it is too late, Congress set forth a detailed process whereby citizens may petition the Service to list a species as endangered or threatened. *Id.* § 1533(b)(3). In response to such a petition, the Service must publish a series of three decisions according to statutory deadlines. First, within 90 days of receipt of a listing petition, the Service must, "to the maximum extent practicable," publish an initial finding as to whether the petition, "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.* § 1533(b)(3)(A). This is known as the "90-day finding."

19. If the Service determines in the 90-day finding that the petition does not present substantial information indicating that listing may be warranted, the petition is rejected, the process concludes, and the Service's negative 90-day finding is judicially reviewable. *Id.* § 1533(b)(3)(C)(ii). If instead the Service determines that a petition presents substantial information indicating that listing

5

"may be warranted," the agency must publish that finding and proceed with a scientific review of the species' status, known as a "status review." *Id.* § 1533(b)(3)(A).

20. Upon completing the status review, and within 12 months of receiving the petition, the Service must publish a "12-month finding" with one of three listing determinations: (1) listing is "warranted"; (2) listing is "not warranted"; or (3) listing is "warranted but precluded" by other proposals for listing species, provided certain circumstances are met. *Id.* § 1533(b)(3)(B).

21. If the Service determines that listing is "warranted," the agency must publish that finding in the Federal Register along with the text of a proposed regulation to list the species as endangered or threatened and to designate critical habitat for the species. *Id.* § 1533(a)(3)(A), (b)(3)(B)(ii). Within one year of publication of the proposed listing rule, the Service must publish a final rule implementing its determination to list the species and designate critical habitat in the Federal Register. *Id.* § 1533(b)(6)(A).

22. If the Service instead issues a finding that listing the species is "not warranted," the process concludes, and that finding is a final agency action subject to judicial review. *Id.* § 1533(b)(3)(C)(ii).

23. The ESA has a suite of substantive and procedural legal protections that apply to species only after they are listed as endangered or threatened. For example, section 4(a)(3) of the Act requires the Service to designate "critical habitat" for each endangered and threatened species. *Id.* § 1533(a)(3). In addition, ESA section 7(a)(2) requires all federal agencies to ensure that their actions do not "jeopardize the continued existence" of any endangered or threatened species or "result in the destruction or adverse modification" of any listed species' critical habitat. *Id.* § 1536(a)(2). ESA section 9 prohibits, among other actions, "any person" from causing the "take" of any protected fish or wildlife without lawful authorization from the Service. *Id.* §§ 1538(a)(1)(B), 1539; *see also id.* § 1532(19)

(defining "take"). Other provisions require the Service to "develop and implement" recovery plans for listed species, *id.* § 1533(f); authorize the Service to acquire land for the protection of listed species, *id.* § 1534; and authorize the Service to make federal funds available to states to assist in the conservation of endangered and threatened species, *id.* § 1535(d).

## FACTUAL BACKGROUND

24. The saltmarsh sparrow (*Ammospiza caudacuta*) is a rare, orange and black-striped bird with a quiet, whisper-like song, that spends the entirety of its life cycle in the coastal salt marshes of the Eastern United States. During the warmer months, saltmarsh sparrows nest in tidal marshes from southern Maine to Virginia. In the winter, the birds migrate south to coastal regions between Delaware and Florida.



Photo Credit: Brett Hartl

25. Unfortunately, the saltmarsh sparrow has suffered significant population declines. A 2022 study found that, in the last 30 years, the species' population has dropped by 87 percent, from a population of 212,000 in 1998, to 60,000 in 2012, and finally to a projected 28,215 in 2020. As a result of the declines, the International Union for the Conservation of Nature lists the saltmarsh sparrow as an

endangered species. The Service itself has recognized the species' decline and has stated the sparrow could face extinction. The annual 9 percent decline in population has made efforts to conserve the saltmarsh sparrow all the more critical, as their numbers dwindle towards extinction.

26. Saltmarsh sparrows are a "specialized species." They depend entirely on intact tidal marshland habitat for essential functions, including diet, breeding, and overwintering.

27. Saltmarsh sparrows are also highly selective in their choice of nesting habitat. Although the species forages throughout tidal marshes, females nest exclusively in the "high marsh," a narrow, grassy strip of land just above the high-water mark. They avoid nesting within 50 meters of tree lines, buildings, and other tall objects, even where vegetation is otherwise suitable. As a result, nests are particularly vulnerable to human development, extreme storms, run-off, and flooding.

28. Since the 1800s, around 38% of tidal marshes have disappeared in the Northeast.

29. The most urgent and immediate threat facing the sparrow is habitat loss caused by rising sea levels. By 2050, the sea is expected to rise 13 to 18 inches across the sparrow's range due to climate change. As sea level rise accelerates, annual spring high tides that normally coincide with the hatching of saltmarsh sparrow eggs are arriving earlier and higher. Between 2030 and 2060, spring tides will arrive so early and so high that the sparrow will be unable to reproduce, guaranteeing its extinction. Climate change will also increase the frequency of extreme storm weather, leading to chick mortality and habitat loss.

30. Coastal development also significantly contributes to the loss of sparrow habitat. Transportation infrastructure fragments tidal marshes, while agricultural ditches and levees restrict water flow. Because of the sparrow's habitat sensitivity, development forces females to nest in suboptimal areas, reducing reproductive success. Increased coastal development also weakens tidal marshes' resiliency to sea level rise. Sediment accretion would normally allow marshes to rise in elevation with

sea levels; however, upland development, such as buildings, barriers, and roads, impedes sediment from properly eroding into marshlands.

31. Oil spills along the East Coast also pose a threat to saltmarsh sparrows. Although major spills along the Eastern Seaboard are rare, the amount of oil shipped via tanker from the Gulf of Mexico has increased. Hundreds of oil spill incidents have occurred directly adjacent to or on the East Coast over the past few decades. Oil-contaminated feathers lose waterproofing, exposing saltmarsh sparrows to temperatures they are not adapted to withstand. As climate change worsens storm flooding, more harmful contaminants will also wash into sparrow habitat.

32. Predation is also a significant cause of saltmarsh sparrow nest failure. The species is vulnerable to a variety of predators, including snakes, larger birds, raccoons, river otters, and voles. As sparrows are forced to move into higher marsh areas due to rising sea levels and storm flooding, their nests are more susceptible to these predators, increasing an already high rate of nest failures.

33. Despite these pressing threats, existing regulatory mechanisms protecting the saltmarsh sparrow and its habitat are inadequate. Several states have recognized the species' declining population and threatened status, but within the sparrow's range Florida, South Carolina, North Carolina, Virginia, Delaware, New York, and Rhode Island offer no protections to the species. While Massachusetts, Maine, and Connecticut do, those protections have been insufficient to prevent the species' continued decline.

34. At a federal level, the Service has partnered with state wildlife agencies, NGOs, and other academic institutions to develop the Saltmarsh Sparrow Conservation Plan which outlines recommendations for conservation strategies, though none are legally binding. The Migratory Bird Act also prohibits the taking of saltmarsh sparrows without a federal permit, but permits are easily obtained for a minimal fee, providing little protection for sparrows.

35. The saltmarsh sparrow's tidal marsh habitat within wetlands is also protected under section 404 of the Clean Water Act ("CWA"), which prohibits any dredging or filling of a jurisdictional wetland without a federal permit. However, the CWA allows other activities—including farming, silviculture, ranching, and the construction of agricultural drainage or irrigation ditches—to take place without a permit. Additionally, while every state within the sparrow's range has adopted either similar or more stringent wetland protection measures, these regulations have done little to stop the continuing decline of saltmarsh sparrow populations.

36. Lastly, other factors like invasive plant species, such as the common reed (*Phragmites australis*), also threaten the continued existence of the species by crowding out native plants essential for sparrow survival.

37. Because of the dire status of the species and the threats facing the saltmarsh sparrow's continued existence, on April 22, 2024, the Center petitioned the Service to list the saltmarsh sparrow as threatened or endangered under the ESA and to designate critical habitat concurrently with listing. The Center's petition documented threats to the sparrow including from rising sea levels, climate change, human development and activity, invasive species, and predation.

38. The Service itself determined the sparrow faces serious threats, and stated that it was undertaking a discretionary status review in the 2019 version of the agency's workplan with an expected completion date of fiscal year 2023. However, the Service failed to complete this review. The sparrow was again included in the 2022, 2023, and 2024 versions of the workplan with an expected completion date of fiscal year 2024, yet it was never completed. The Center petitioned for listing of the species following the Service's failure to take voluntary action and it has now been almost two years since the Service received the Center's petition. Yet, the Service has not issued a 90-day finding on the Center's petition even though the statutory deadline for such a finding was April 22, 2025.

39. The Service's failure to publish a timely 90-day finding on the Center's petition has also delayed the Service's statutorily required 12-month finding. 16 U.S.C § 1533(b)(3)(B) (the Service must make a 12-month finding no later than one-year from receipt of the petition).

## CLAIM FOR RELIEF

**Violation of the ESA for Failure to Publish a Timely 90-Day Finding for the Saltmarsh Sparrow**

40. Plaintiff re-alleges and incorporates by reference all prior allegations.

41. The ESA requires the Service to publish its initial finding within 90-days of receipt of the petition "to the maximum extent practicable," 16 U.S.C § 1533(b)(3)(A), but the Service must publish such a finding within one year of the petition's submittal.

42. The Service received the Center's petition to list the saltmarsh sparrow on April 22, 2024, yet to date—almost two years later—the Service has not issued the required 90-day finding on the petition.

43. Defendants' failure to perform their nondiscretionary duty to timely publish a 90-day finding violates the ESA. *Id.*

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

a. Declare that Defendants violated the ESA by failing to issue a timely 90-day finding in response to the Center's petition to list the saltmarsh sparrow under the ESA and concurrently designate critical habitat;

b. Provide injunctive relief compelling Defendants to issue the 90-day finding by a date certain;

      c.      Retain continuing jurisdiction to review Defendants' compliance with all judgements and orders herein;

      d.      Grant Plaintiff its reasonable attorney's fees and costs provided by the ESA, 16 U.S.C. § 1540(g)(4); and

      e.      Provide such other relief as the Court deems just and proper.

Dated: February 11, 2026

Respectfully submitted,

*/s/ Ryan Adair Shannon*
Ryan Adair Shannon
D.D.C. Bar No. OR0007
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
T: 971-717-6407
F: 503-283-5528
E: rshannon@biologicaldiversity.org

Lia Comerford
*Pro Hac Vice Pending*
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
T; (971) 717-6420
F: 503-283-5528
E: lcomerford@biologicaldiversity.org